UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MPH TECHNOLOGIES OY, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) |
| v. | ) |
| | ) No.: 1:10-CV-00684 |
| ZYXEL COMMUNICATIONS | ) |
| CORPORATION, ZYXEL | ) Hon. Judge Darrah |
| COMMUNICATIONS, INC., NETGEAR, | ) Hon. Magistrate Judge Cox |
| INC., CHECK POINT SOFTWARE | ) |
| TECHNOLOGIES, LTD., AND CHECK | ) |
| POINT SOFTWARE TECHNOLOGIES, INC., | ) |
| | ) |
| Defendants. | ) |

**DEFENDANTS NETGEAR, INC., CHECK POINT SOFTWARE
TECHNOLOGIES INC. AND ZYXEL COMMUNICATIONS, INC.,'S
MEMORANDUM IN SUPPORT OF MOTION TO TRANSFER VENUE**

Defendants ZyXEL Communications, Inc. ("ZyXEL, Inc."), NETGEAR, Inc.
("NETGEAR"), and Check Point Software Technologies Inc. ("CP Inc.") (collectively
"Defendants") respectfully submit this memorandum in support of their motion to transfer this
action to the Northern District of California under 28 U.S.C. § 1404(a).[1]

## I.      INTRODUCTION

This case – which will predominantly impact California companies and California
citizens – belongs in the Northern District of California because most of the parties, witnesses
and evidence that will drive the resolution of the parties' dispute reside in California.

---

[1] While Plaintiff MPH Technologies OY also named ZyXEL Communications Corporation and Check
Point Software Technologies Ltd. as Defendants, it has not executed service on these foreign
corporations. Accordingly, neither entity has appeared in this case.

Specifically:

- All three Defendants – NETGEAR, CP Inc. and ZyXEL, Inc. – operate their principal places of business in California;

- At their California headquarters, these Defendants carry out their decision-making activities, financial operations, marketing and other core business activities;

- Most of Defendants' witnesses and known third-party witnesses familiar with the design, development and other business aspects, including finance, marketing and sales, of the accused products are California citizens; and

- The bulk of Defendants' documents relating to the technical, financial and sales aspects of the accused products are maintained in California.

In marked contrast, the Northern District of Illinois lacks any substantial connection to this case. Plaintiff MPH Technologies OY ("MPH") is a Finnish corporation with its principal place of business in Espoo, Finland. Without any apparent connection to the Northern District of Illinois, MPH nevertheless filed suit here. Indeed, none of the parties in this case were incorporated or have a principal place of business in Illinois. The material events giving rise to MPH's patent infringement claims did not occur here. Not a single witness resides in this district. And virtually none of the physical evidence is located here.

All of the three factors that federal courts examine when determining whether to transfer venue militate strongly in favor of transfer to the Northern District of California. First, venue is proper in the Northern District of California. Second, transfer to that district would be far more convenient for the parties and known witnesses. And third, allowing the Northern District of California to resolve a dispute involving primarily California-based companies whose businesses are centered in California is in the interest of justice. This Court should therefore exercise its discretion under 28 U.S.C. § 1404(a) and transfer this case to the Northern District of California.

## II.    FACTUAL BACKGROUND

### A.    The Northern District of Illinois Lacks Any Substantial Connection to This Case.

Plaintiff MPH is a foreign corporation with its principal place of business in Finland. (*See* Compl. at ¶ 2.)  MPH has no apparent connection to the Northern District of Illinois.  It purportedly owns all right, title and interest in United States Patent 7,346,926 ("the '926 Patent") and has standing to sue for infringement.  (*See id.* at ¶ 3.)  And it filed this lawsuit against the three unrelated Defendants alleging they each infringe the '926 Patent.  (*See id.* at ¶¶ 15-23.)

MPH's patent infringement claims are based on the design of Defendants' network security technologies.  The accused products of Defendants (MPH identifies 9 NETGEAR products, 12 CP Inc. products and 9 ZyXEL, Inc. products) provide customers with secured access to their computer networks (the "Accused Products").[2]  MPH's Complaint broadly alleges, among other things, that Defendants' acts of infringement include "making, using, marketing, distributing, providing, testing, configuring, selling and/or offering to sell in the United States and importing into the United States" their Accused Products.  (*See id.* at ¶¶ 15, 18, 21.)  The issues central to this case, therefore, will include the Defendants' respective design, development, manufacturing, distribution, marketing and sales of the Accused Products – none of which has a specific connection to the Northern District of Illinois.

Instead, most of the evidence, including witnesses and documents, relevant to these issues is located in California, where all three Defendants have their principal places of business. As such, California, and, specifically, the Northern District of California, is a far more convenient forum for Defendants.

---

[2] Rather than specifically name each of these 30 products (the identities of which are not relevant to this analysis), Defendants will refer to them generally as the Accused Products.

### NETGEAR

Defendant NETGEAR is a Delaware corporation with its principal place of business in San Jose, California. (*See* Henry Decl. at ¶ 2, attached as Ex. 1.) NETGEAR's executives and employees expected to testify in this case all reside in or around San Jose. (*See id.* at ¶ 13.) For example, NETGEAR's Vice President of Engineering, Derek Lam, will likely testify regarding the Accused Products' development, design and function to support NETGEAR's defenses in this case. (*See id.*) Additionally, a substantial number of NETGEAR's third-party suppliers, who are potential witnesses in this case, are located in California. (*See id.* at ¶¶ 9, 10.) These suppliers provide, among other things, components (known as chipsets) used in the Accused Products. (*See id.*) Additionally, NETGEAR maintains all documents, databases and other materials that are relevant to the allegations in MPH's Complaint at its San Jose headquarters. (*See id.* at ¶¶ 6, 16.) With the exception of a single account manager who has little, if any, information about the Accused Products, NETGEAR has no facilities, offices, employees or business records in Illinois. (*See id.* at ¶¶ 6, 12, 15.)

### CP Inc.

Defendant CP Inc. is a Delaware corporation with its principal place of business in Redwood City, California. (*See* Woodley Decl. at ¶ 5, attached as Ex. 2.) All of CP Inc.'s executives and employees who are expected to testify in this case work in Redwood City and reside in or around Redwood City. (*See id.* at ¶ 9.) Among its expected witnesses is Douglas Woodley, Head of Western America Sales, who will provide important and necessary testimony regarding the implementation, pricing, sales and revenues associated with the Accused Products. (*See id.* at ¶¶ 1, 9.) And most of the documents and other materials relevant to CP Inc.'s Accused Products are located in Redwood City. (*See* Woodley Decl. at ¶ 10, Ex. 2.)

**ZyXEL, Inc.**

Defendant ZyXEL, Inc. is a California corporation with its principal place of business in Anaheim, California.[3] (*See* Patrick Decl. at ¶ 2, attached as Ex. 3.) ZyXEL, Inc.'s executives and employees who are expected to testify in this matter reside near the company's headquarters in Anaheim or near its Santa Clara, California office. (*See id.* at ¶¶ 10-14.) Additionally, ZyXEL, Inc. expects that a representative from its third-party software supplier, TheGreenBow, which has its United States office in San Francisco, will testify. (*See id.* at ¶ 15.) ZyXEL, Inc.'s documents, databases and other materials relevant to the Accused Products are located in Anaheim. (*See id.* at ¶ 16.) ZyXEL, Inc. does not have any offices, facilities or employees in Illinois, other than a lone employee who works out of his home on products unrelated to the Accused Products. (*See id.* at ¶¶ 7, 10-14, 16.)

In sum, Defendants' businesses are centered in California, where they make their business decisions, conduct their financial operations, carry out their marketing initiatives and conduct other core business activities relating to the Accused Products. Additionally, most of Defendants' evidence and witnesses, as well as third-party witnesses, are located in California. None of Defendants' expected witnesses or evidence is located in the Northern District of Illinois.

## III.   LEGAL ARGUMENT

### A.   Applicable Legal Standard.

Change of venue in patent cases, like other civil cases, is governed by 28 U.S.C. § 1404(a). Section 1404(a) provides that "[f]or the convenience of parties and witnesses, in the

---

[3] Anaheim is in the Central District of California, about 300 miles from the other Defendants in the Northern District of California.

interest of justice, a district court may transfer any civil action to any other district or division where it might have been brought." 28 U.S.C. § 1404(a). District courts have broad discretion to grant motions to transfer, and the moving party bears the burden of showing that the transfer is proper. *See MLR, LLC v. Kyocera Wireless Corp.*, No. 04 C 7044, 2005 WL 818399, at *1 (N.D. Ill. Apr. 6, 2005) (Darrah, J.). To do so, the moving party must demonstrate: "(1) venue is proper in both the transferor and transferee courts; (2) it is for the convenience of the parties or witnesses; and (3) it is in the interest of justice." *Id.*

Here, where Defendants and most of the evidence, known witnesses and relevant events are centered in California, each of these factors weighs heavily in favor of transferring this case to the Northern District of California. Importantly, no single factor weighs in favor of denying this motion.

**B.     Venue In the Northern District of California and This District.**

Venue is proper in the Northern District of California. "In a patent case, venue is proper in a district if that district can exercise personal jurisdiction over the defendant." *MLR*, 2005 WL 818399, at *1 (citing *VE Holding Corp. v. Johnson Gas Appliance Co.*, 917 F.2d 1574, 1584 (Fed. Cir. 1990).) Defendants reside in the Northern District of California, committed alleged acts of infringement in that district and have established places of business there. *See* 28 U.S.C. § 1400(b). For purposes of this motion, Defendants do not dispute that venue is also proper in this District.

**C.     The Convenience of the Parties and Witnesses Favors Transfer to the Northern District of California.**

In weighing the convenience of the parties and witnesses, the following factors are relevant: (1) the plaintiff's choice of forum; (2) the situs of material events; (3) the convenience to the witnesses; (4) the convenience to the parties; and (5) the relative ease of access to sources

of proof. *E.g.*, *Tissue Extraction Devices, LLC v. Suros Surgical Sys., Inc.*, No. 08 C 140, 2008 WL 4717158, at *2 (N.D. Ill. May 20, 2008). Thus, MPH's claims against Defendants belong in the Northern District of California because four of these five factors favor transfer.

### 1. MPH's Choice of Forum Should Be Afforded Nominal Weight.

While a plaintiff's choice of forum is often entitled to deference, where the plaintiff does not reside in the forum district, the plaintiff's choice is "simply another factor in the mix and is not given any additional weight." *The Heil Co. v. Curotto Can Co.*, No. 02 C 782, 2004 WL 725737, at *2 (N.D. Ill. Mar. 30, 2004). The deference to the plaintiff's chosen forum is further minimized when the forum lacks any significant connection to its claims, *Id.*, and when it is not the site of the material events giving rise to the claims. *See Law Bulletin Pub., Co. v. LRP Pubs., Inc.*, 992 F. Supp. 1014, 1017 (N.D. Ill. 1998). As discussed below, patent infringement cases center around the activities and business of the alleged infringer, *see Gen 17, Inc. v. Sun Microsys., Inc.*, 953 F. Supp. 240, 243 (N.D. Ill. 1997), and the alleged infringer's sales alone are not enough to establish a substantial connection to the forum when its goods are sold throughout the country. *Anchor Wall Sys., Inc. v. R & D Concrete Prods., Inc.*, 55 F. Supp. 2d 871, 874 (N.D. Ill. 1999).

Here, MPH's choice of forum is not entitled to deference. The Northern District of Illinois is not MPH's home forum. Indeed, MPH is a Finnish corporation with its principal place of business in Finland. Additionally, its claims are not limited to or even centered on conduct that occurred in Illinois. In attempting to bolster Defendants' connections to the Northern District of Illinois, MPH alleges that the Accused Products are sold and offered for sale in this

District, and incorrectly claims that Check Point has two sales offices here.[4] (*See* Compl. at ¶¶ 6, 9, 12.)  But MPH also admits that Defendants' products, including the Accused Products, are sold throughout the United States.  (*See id.*)  Defendants' sales therefore are insufficient to establish a substantial connection to this District because the Accused Products are sold throughout the country.  *Anchor Wall Sys.*, 55 F. Supp. 2d at 874 ("[S]ales alone are insufficient to establish a substantial connection to the forum if the defendants' goods are sold in many states.").  "Where it appears, as here, that plaintiff could have sued in many different districts and there is no particular reason why plaintiffs would prefer this district" this Court should not defer to MPH's forum choice – particularly in light of the fact that the other four factors favor transfer.  *See Ambrose v. Steelcase, Inc.*, No. 02 C 2753, 2002 WL 1447871, at *3 (N.D. Ill. July 3, 2002).

MPH apparently filed this lawsuit in the Northern District of Illinois for the convenience of its counsel.  The location of a party's counsel, however, bears no relevance to whether a transfer is convenient to the parties and witnesses.  *See Tissue Extraction Devices*, 2008 WL 4717158, at *2 (finding convenience of Plaintiff's counsel is inappropriate consideration in the transfer analysis).  Accordingly, MPH's arbitrary decision to file suit in this forum, which is not home to any of the parties or relevant events, holds little weight in the analysis of whether transfer is appropriate.

      **2.**      **The Situs of Material Events Weighs in Favor of Transfer to the Northern District of California.**

The second factor – the situs of material events – weighs in favor of transfer to the Northern District of California.  For venue purposes, the situs of material events in patent infringement cases is "the location where the defendant's decisions and activities that gave rise

---

[4] CP Inc. has only one sales office in this District. (Woodley Decl. at ¶ 8, Ex. 2.)  The office is located in Downers Grove, Illinois, and is a rented space available only to the 26 sales employees. (*See id.*)

to the claim took place." *First Horizon Pharm. Corp. v. Breckenridge Pharm., Inc.*, No. 04 C 2728, 2004 WL 1921059, at *3 (N.D. Ill. July 21, 2004).   Therefore, "the location of the infringer's place of business is often the critical and controlling consideration." *Technical Concepts L.P. v. Zurn Indus., Inc.*, No. 02 C 5150, 2002 WL 31433408, at *3 (N.D. Ill. Oct. 31, 2002) (citation omitted).

Here, the material events occurred in California for all three Defendants.   Indeed, the decision-making, financial operations, marketing and other core business activities relating to these Defendants' Accused Products occurred at their headquarters in California.   Thus, this factor strongly supports transfer to that venue.   *See MLR*, 2005 WL 818399, at *2 (finding that the situs of the material events – defendants' alleged infringement of the patents – occurred in California where defendants conducted their businesses).

While MPH may argue that Defendants offer to sell and sell their Accused Products in Illinois, as well as throughout the country, that fact does not weigh in favor of keeping the case here.   When the accused technologies are sold nationwide, sales within the plaintiff's chosen forum are not considered material events giving rise to the action.   *See Anchor Sys.*, 55 F. Supp. 2d at 874; *see also Greene Mfg. Co. v. Marquette Tool & Die Co.*, No. 97 C 8857, 1998 WL 395155, at *2 (N.D. Ill. July 9, 1998) (concluding that defendant's 7.6% sales of accused products in Northern District of Illinois did not make Illinois the situs of the material events). For example, annual sales of Defendant ZyXEL, Inc.'s Accused Products in Illinois last year represented only 0.26% of ZyXEL, Inc.'s total annual sales of these products in the United States. (*See* Patrick Decl. at ¶ 9, Ex. 3.)   This factor therefore weighs in favor of transfer.

### 3.     The Location of the Known Witnesses Weighs in Favor of Transfer.

The convenience of the witnesses is "one of the most important factors when deciding on

an appropriate forum." *VPS, LLC v. Shutterfly, Inc.*, No. 04 C 1709, 2004 WL 1557954, at *2 (N.D. Ill. July 8, 2004) (Darrah, J.).  District courts consider not only the number of witnesses located in each forum, but also the particular witnesses identified and quality and nature of their proposed testimony.  *See id.*  While the location of non-party witnesses is typically most significant, the location of employee witnesses is important in cases involving intellectual property because the defendants' employees have most of the relevant knowledge about the development, manufacture and sale of the accused products. *See Matweld, Inc. v. Portaco, Inc.*, No. 04 C 1273, 2004 WL 1403696, at *2 (N.D. Ill. June 23, 2004).  In evaluating witness convenience, the Court should consider "the number of witnesses located in each forum; the nature, quality, and importance of the witnesses' testimony with respect to the issues of the case; the expense of transportation and the length of time the witnesses will be absent from their jobs; and whether the witnesses can be compelled to testify." *Event News Network, Inc. v. Thill*, No. 05 C 2972, 2005 WL 2978711, at *5 (N.D. Ill. Nov. 2, 2005); *Ambrose*, 2002 WL 1447871, at *3.

Defendants have numerous executives and employee witnesses, including engineers and other technical personnel, with knowledge of the design, development, marketing and sales of the Accused Products and all of these witnesses are located in the Northern or Central Districts of California.  (*See* Henry Decl. at ¶ 13, Ex. 1; Woodley Decl. at ¶ 9, Ex. 2; Patrick Decl. at ¶¶ 10-14, Ex. 3.)  Transfer to the Northern District of California would therefore facilitate live testimony from these witnesses.  Keeping this litigation in the Northern District of Illinois, on the other hand, would impose unnecessary burdens on these witnesses, including the time and expense of travel. *See MLR*, 2005 WL 818399, at *2 (finding convenience of witnesses factor favored transfer where all of defendants' witnesses, current and former employees, were in

California and all of plaintiff's witnesses were outside its chosen forum).

Additionally, a substantial number of the known third-party witnesses reside in or around California. These witnesses include third-party suppliers who provide software and components to Defendants NETGEAR and ZyXEL, Inc.[5] (*See* Henry Decl. at ¶ 9-10, Ex. 1; Patrick Decl. at ¶ 15, Ex. 3.) Transfer to the Northern District of California would increase the likelihood that a number of these witnesses testify at court proceedings and trial because the Northern District of California can compel witnesses within the district (and 100 miles outside that district) to appear. The Northern District of Illinois, on the other hand, has no jurisdiction over any witness who lives more than 100 miles from this District. *See* Fed. R. Civ. P. 45. Considering the convenience to the witnesses, this factor weighs strongly in favor of transfer to the Northern District of California.

### 4.     The Convenience to the Parties Strongly Favors Transfer.

Another relevant factor is the overall convenience to the parties. *Ambrose*, 2002 WL 1447871, at *4. The Court should consider the parties' respective residences and ability to bear the expenses of litigating in a particular forum. *Id.* The time and expense to litigate this dispute halfway across the country will be significant for Defendants – all of which operate their headquarters in California. Not only are Defendants CP Inc.'s and NETGEAR's probable witnesses located in the Northern District of California, but most of their documents and data relating to their Accused Products are there. (*See* Woodley Decl. at ¶¶ 9, 10, Ex. 2; Henry Decl. at ¶¶ 13, 16, Ex. 1.) Similarly, Defendant ZyXEL, Inc.'s witnesses, documents and data relating

---

[5] For example, ZyXEL, Inc. intends to call a representative from TheGreenBow, a third-party software vendor, which has a US office in the Northern District of California. (*See* Patrick Decl. at ¶ 15, Ex. 3.) And NETGEAR may present testimony from its software or chipset suppliers – a large number of which are located in the Northern District of California. (*See* Henry Decl. at ¶¶ 9, 10, Ex. 1.)

to the Accused Products are located in either the Central or Northern Districts of California. (*See* Patrick Decl. at ¶¶ 10-16, Ex. 3.)

Admittedly, transfer is "inappropriate if it merely transforms an inconvenience" from one party to another. *Ambrose*, 2002 WL 1447871, at *4 (citations and internal quotations omitted). But that is not the case here. To start, this district is *not* MPH's home forum. Additionally, transfer to the Northern District of California would allow Defendants to litigate near their corporate headquarters. Transfer to the Northern District of California, therefore, would be "more than a just a mere shift in inconvenience." *S.C. Johnson & Son, Inc. v. Buzz Off Insect Shield, LLC*, No. 05 C 1046, 2005 WL 1838512, at *3-4 (N.D. Ill. July 28, 2005). Moreover, because MPH is a Finnish corporation with its principal place of business in Espoo, Finland, there is no increased inconvenience to MPH to litigate this dispute in the Northern District of California rather than Chicago. Its foreign executives and employees, who will likely testify at trial, will be required to travel to the United States for trial whether the forum for this case is Chicago or northern California. *See Confederation Des Brasseries De Belgique v. Coors Brewing Co.*, No. 99 C 7526, 2000 WL 88847, at *5 (N.D. Ill. Jan. 20, 2000) (convenience of the parties analysis narrowly favored transfer to a Colorado district where defendant resided in that district, while the plaintiff resided in Belgium and could not show that litigating in Colorado would be significantly more inconvenient than litigating in Chicago). This factor therefore weighs in favor of transfer.

### 5.     The Location of the Relevant Proof Weighs in Favor of Transfer to the Northern District of California.

In assessing the final convenience factor, nearly all of the evidence is this case is located in California, which favors transfer to the Northern District of California. *See VPS*, 2004 WL

1557954, at *3 (finding location of evidence favored transfer where most of the evidence was likely to be found at defendant's principal place of business in Northern California). As discussed above, most of Defendants' evidence, including its documents, data and witnesses, relating to the Accused Products is located in the Northern District of California or in the nearby Central District of California. Moreover, Defendants are not aware of any relevant documents, data or witnesses in the Northern District of Illinois. (*See* Henry Decl. at ¶¶ 13, 16, Ex. 1; Woodley Decl. at ¶¶ 9, 10, Ex. 2; Patrick Decl. at ¶¶ 10-16, Ex. 3.) This factor therefore weighs in favor of transfer.

In sum, because the events that give rise to this litigation occurred in California, Defendants' businesses are centered in California, most of Defendants' witnesses and known third-party witnesses reside in California and the bulk of the relevant documents are in California, the Northern District of California is a more convenient forum for the resolution of this dispute.

**D.      The Interests of Justice Favor Transfer to the Northern District of California.**

Finally, in deciding whether to transfer to another district, the Court should consider "traditional notions of judicial economy, such as (1) relations of the community to the issues; (2) ensuring a speedy trial; and (3) the respective courts' familiarity with the applicable law." *Matweld Inc. v. Portaco, Inc.*, No. 04 C 1273, 2004 WL 1403696, at *3 (N.D. Ill. June 23, 2004).

Without question, this dispute implicates the interests of the community in the Northern District of California far more than in this District. Defendants NETGEAR and CP Inc. maintain headquarters in the Northern District of California, Defendant ZyXEL maintains an office there and collectively Defendants employ hundreds of people throughout northern California. *See Confederation*, 2000 WL 88847, at *5-6 (finding Colorado had greater relation to issues in the

case, where defendant maintained corporate headquarters and employed thousands of people). Additionally, MPH seeks injunctive relief to prohibit Defendants' alleged infringement of the '926 Patent, which, if granted, would need to be enforced in California. *See id.* This enforcement would have a far greater effect on the community in the Northern District of California than here in Illinois. *See id.* *6 (noting that injunctive relief would clearly effect the Denver community, where it would be enforced, more than it would effect the Chicago community). Transfer to the Northern District of California would therefore be "consistent with the notion that the administration of justice is served more efficiently when the action is litigated in the forum that is closer to the action." *Id.* (internal citation and quotations omitted).

The courts in this District and the Northern District of California are equally familiar with the federal questions raised in patent infringement suits. The analysis as to this factor is therefore neutral.

As for ensuring a speedy trial, the most recent statistics show that the Northern District of California may resolve this patent case somewhat more quickly than the Northern District of Illinois.[6] The case management statistics show that from filing to trial, a case in the Northern District of California takes on average 24.5 months, while a case in the Northern District of Illinois takes 27.8 months. (*See* Moore Decl. at ¶ 3, attached hereto as Ex. 4.) A recent study of the median time-to-trial for patent cases, in particular, reinforces that this case may well go to trial earlier in the Northern District of California. (*See id.* at ¶¶ 4-5) (median time-to-trial in Northern District of California is 2.87 years versus 3.42 years in Northern District of Illinois).

---

[6] Alternatively, the Court may look at the relative congestion of the court dockets. *See VPS*, 2004 WL 1557954, at *3. In 2009, the Northern District of Illinois had 423 filings per judge and the Northern District of California had 541. (*See* Moore Decl., Ex. A at Ex. 4.) And both districts are among the top six in the country based on the number of patent suits filed in 2009. (*See id.* at ¶ 7.) This factor, therefore, weighs neither in favor of nor against transfer.

This six-month difference weighs at least slightly in favor of transfer. *See First Horizon Pharm.*, 2004 WL 1921059, at *5 (finding that eight-month difference between time-to-trial in two forums slightly favored transfer to quicker forum).

If transferred, this case will be litigated in a forum that has a more substantial connection to the issues of the litigation and the community of northern California and may proceed to trial more quickly. Traditional notions of judicial economy therefore favor transfer.

## IV.   CONCLUSION

Because the convenience of the parties and witnesses and the interest of justice strongly weigh in favor of transfer, Defendants respectfully request the Court transfer this case to the Northern District of California.

Dated:  May 17, 2010                              Respectfully submitted,


By:      /s/ James T. Hultquist
        James T. Hultquist (SBN 6204320)
        Email:  jhultquist@reedsmith.com
        Raven Moore (SBN 6280665)
        Email:  rmoore@reedsmith.com
        REED SMITH LLP
        10 South Wacker Drive
        Chicago, IL  60606-7507
        Telephone:   +1 312 207 1000
        Facsimile:   +1 312 207 6400

        *Counsel for* NETGEAR, Inc., Check Point
        Software Technologies Inc. and ZyXEL
        Communications, Inc.

103744860v1

15

# EXHIBIT 1

# FILED UNDER SEAL

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MPH TECHNOLOGIES OY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No.: 1:10-CV-00684 |
| ZYXEL COMMUNICATIONS | ) | |
| CORPORATION, ZYXEL | ) | Hon. Judge Darrah |
| COMMUNICATIONS, INC., NETGEAR, | ) | Hon. Magistrate Judge Cox |
| INC., CHECK POINT SOFTWARE | ) | |
| TECHNOLOGIES, LTD., AND CHECK | ) | |
| POINT SOFTWARE TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF DAVID HENRY IN SUPPORT OF
## NETGEAR, INC.'S MOTION TO TRANSFER VENUE

I, David Henry, hereby declare the following:

1.     I am currently employed at NETGEAR, Inc. as Senior Director of Product Marketing, Consumer Group.  I make this declaration in support of NETGEAR, Inc.'s motion to transfer venue of this litigation to the Northern District of California.  I have personal knowledge of the facts stated in this declaration and if called upon to do so, I will testify competently to them.

2.     NETGEAR, Inc. (hereafter "NETGEAR") is a Delaware corporation with its principal place of business located at 350 East Plumeria Drive, San Jose, California, 95134.

3.     As Senior Director of Product Marketing for the Consumer Group, I am responsible for NETGEAR's product line strategy, NETGEAR's product roadmaps, partnering with the engineering and cross functional teams to deliver the NETGEAR's product portfolio, market analyses, NETGEAR's product launch planning and management, NETGEAR's product packaging, and partnering with NETGEAR's corporate marketing personnel on various

marketing campaigns.  I am therefore knowledgeable about many aspects of NETGEAR's business, including product development, product design, product marketing, product distribution, product sales.  I also have a good working knowledge of the functional and technical specifications of NETGEAR's product portfolio.

4.      NETGEAR is a worldwide provider of technologically innovative, branded networking solutions, including network security devices.

5.      I understand that MPH Technologies OY alleges in its Complaint in the above-referenced litigation that NETGEAR has infringed one or more claims of United States Patent No. 7,346,926 with products such as the ProSafe VPN Client Software, Dual WAN Gigabit SSL VPN Firewall, ProSafe Dual WAN VPN Firewall with 8-port 10/100 Switch, ProSafe VPN Firewall with 8-port 10/100 Switch, ProSafe VPN Firewall 8 w/8 Port 10/100 Switch, ProSafe VPN Firewall 8 with 4 Port 10/100 Mbps Switch, ProSafe 802.11g Wireless ADSL Modem VPN Firewall Router, ProSafe Wireless-N VPN Firewall, and ProSafe 802.11 Wireless VPN Firewall 8 with 8-port 10/100 Mbps Switch (the "Accused Products.")

6.      NETGEAR's company headquarters are in San Jose, California, with additional offices in 25 countries.  The vast majority of NETGEAR's approximately 300 full-time United States-based executives and employees are located at its headquarters in San Jose.  All of NETGEAR's corporate records and business records are maintained in San Jose, as well. Accordingly, NETGEAR's decision-making activities, research and development, financial operations, marketing and other core business activities all take place in San Jose.  NETGEAR does not have any offices or facilities in Illinois.

7.      NETGEAR outsources the manufacturing of its products to original design manufacturers ("ODMs") headquartered in Taiwan.  NETGEAR works with the engineering

teams of these ODMs to create the system-level design, layout and build of materials for the NETGEAR products, including the incorporation of chipsets and software.  This work is performed in San Jose and Taiwan.  NETGEAR's accused products are manufactured by Cameo Communications, Inc. of Taiwan,  Hon Hai Precision Industries Co. Ltd. of Taiwan, Pegatron Corporation of Taiwan, and SerComm Corporation of Taiwan.

8.      Plaintiff's claims in this litigation will likely involve services provided by one or more of these ODMs.  In any event, representatives of these ODMs will have specific information and evidence regarding the Accused Products in this case.  Northern California is much closer to Taiwan than northern Illinois.  Further, substantially all of NETGEAR's technical personnel are located either in northern California or China.

9.      In addition, many of the technical features of NETGEAR's products are contained in components (called "chipsets") that are supplied to NETGEAR by third-party companies (the "chipset suppliers").  Atheros Communications, Inc., Broadcom Corporation, Cavium Networks, Realtek Semiconductor Corporation, and Intel Corporation supply all of the chipsets implemented in NETGEAR's accused products.  Atheros and Intel are located in Santa Clara, California. Broadcom is located in Irvine, California. Cavium Networks is located in Mountain View, California. Realtek Semiconductor Corporation is located in Taiwan.  Thus, when NETGEAR has technical questions regarding these chipsets, it frequently contacts the chipset suppliers' engineers in and around California.  The claims made by Plaintiff in this litigation may involve technology provided by one or more of these chipset suppliers.  In any event, representatives of these suppliers may have specific information and evidence regarding the technology at issue in this case.

10.     NETGEAR's technical support for the Accused Products is handled from California, Utah and other call centers throughout the world.   No technical support for the Accused Products occurs from Illinois.     Third-parties Safenet, Inc. ("Safenet") and TheGreenBow have provided and provide the client software for the alleged infringing products. Safenet is located in Baltimore, Maryland. While Safenet has an office in Illinois, it also has several in California, and NETGEAR has not had dealings with Safenet's office in Illinois. TheGreenBow is headquartered in Paris, France and has a North American office located in San Francisco, California.   No sales or support offices for TheGreenBow are located in Illinois.

11.     The distribution of all of NETGEAR's products takes place from one of three distribution centers throughout the world.   The distribution centers are located in Hong Kong, Netherlands, and Long Beach, California.   No distribution center is located in Illinois.

12.     NETGEAR's only employee in Illinois is an account manager who would have little, if any, information about the Accused Products.     In addition, any information this employee has about the Accused Products would also be in the San Jose headquarters of NETGEAR.

13.     The NETGEAR executives and employees expected to be called to testify as witnesses at trial in this case all work at NETGEAR's San Jose headquarters.   All of these witnesses reside in or around San Jose.   These NETGEAR executives and employees include but are not limited to:

- Derek Lam.  Mr. Lam is the Vice President of Engineering who assisted in the development and design of the Accused Products.  Mr. Lam has served as Vice President of Engineering since January 2010, and has been employed at NETGEAR in an engineering capacity since March 2007. Mr. Lam works at NETGEAR's San Jose headquarters and resides in ██████, California.  As Vice President of Engineering, Mr. Lam is responsible for engineering for NETGEAR's small and medium business products.   NETGEAR anticipates that it will rely upon Mr. Lam's

knowledge related to the Accused Products' development, design, and function to support its defenses in this litigation. In addition, extended travel to Illinois would present a hardship to Mr. Lam's family, ███████ ██████.

- Jason Leung. Mr. Leung is a Product Line Manager who assisted in the development and marketing of the Accused Products. Mr. Leung has served as Product Line Manager, and has been employed at NETGEAR in this capacity since 2008. Mr. Leung works at NETGEAR's San Jose headquarters and resides in ███████, California. NETGEAR anticipates that it will rely upon Mr. Leung's knowledge related to the Accused Products' development, pricing, marketing, and functionality to support its defenses in this litigation. Mr. Leung would experience extreme hardship if he was required to travel to Illinois as ███████████████████████.

- Peter Newton. Mr. Newton is currently the Director of Small and Medium Business Product Marketing, and has served in this capacity since October 2008. From August 2007-October 2008, Mr. Newton was a Product Line Manager for Security and Wireless Devices, who assisted in the development and marketing of the Accused Products. Mr. Newton is employed in NETGEAR's San Jose headquarters and resides in █████, California. NETGEAR anticipates that it may rely upon Mr. Newton's knowledge related to the Accused Products' development, pricing, marketing, and functionality to support its defense in this litigation. Mr. Newton would experience hardship if he was required to travel to Illinois due to his responsibilities associated with ████████.

- David Quong. Mr. Quong is the Senior Director of Financial Planning, and has served in that capacity since 2005. In his capacity as Senior Director of Financial Planning, Mr. Quong is knowledgeable about the sales and revenues associated with the Accused Products as well as NETGEAR's financial and accounting systems. Mr. Quong is employed in NETGEAR's San Jose headquarters and resides in ███████, California. NETGEAR anticipates that it will rely upon Mr. Quong's knowledge related to the sales and revenues associated with the Accused Products to support its defenses in this litigation.

- Rule 30(b)(6) deponents. To the extent that MPH seeks any depositions of corporate designees of NETGEAR, such corporate designees likely work in NETGEAR's San Jose headquarters and reside in California. It is conceivable, though unlikely, that a NETGEAR employee in China could be designated as a corporate witness for some of the technical aspects of NETGEAR's products. If this were the case, it would nevertheless be

more convenient for the employee to travel to California rather than Illinois for the deposition.

14.     In addition, NETGEAR's Director of Intellectual Property, Brian Busse, who is responsible for this litigation works at NETGEAR's San Jose headquarters and resides in ███ ███, California.

15.     NETGEAR's business activity in Illinois is limited to sales carried out by authorized third parties and the activities of NETGEAR's single account manager located in Illinois.  Annual sales of NETGEAR's Accused Products in Illinois represent only █ percent of NETGEAR's total annual sales in the United States.

16.     NETGEAR has within its custody or control a large volume of documents, as well as databases and related materials, which pertain to particular technical, financial, and sales aspects of the Accused Products.  These documents are located at the company headquarters in San Jose, California and in off-site storage facilities in and around San Jose, California.  To locate and review such information will require the efforts of a number of personnel located in or around San Jose.  NETGEAR maintains no such information in the Northern District of Illinois.  All of NETGEAR's information maintained domestically is located in or around San Jose, California.

17.     In sum, to defend this lawsuit in Illinois will be a far greater burden to NETGEAR and its witnesses than if the case were transferred to the Northern District of California.  NETGEAR also understands that it will significantly burden co-Defendants and their witnesses and most of the third-party witnesses.  As detailed above, requiring NETGEAR's witnesses to travel to Chicago for court proceedings and trial will professionally and personally inconvenience them.  Additionally, if these executives and employees must travel to Illinois and

spend time away from NETGEAR's business, this will inevitably harm its business operations, as it operates in a highly competitive, ever-changing industry.  The travel costs alone to transport its executives and employees to Illinois will be significant.  Such costs would be drastically reduced if the Court transfers this case to the Northern District of California.

18.     In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, executed on this 17th day of May, 2010.

DAVID HENRY

# EXHIBIT 2

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| MPH TECHNOLOGIES OY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | |
| | ) | No.: 1:10-CV-00684 |
| ZYXEL COMMUNICATIONS | ) | |
| CORPORATION, ZYXEL | ) | Hon. Judge Darrah |
| COMMUNICATIONS, INC., NETGEAR, | ) | Hon. Magistrate Judge Cox |
| INC., CHECK POINT SOFTWARE | ) | |
| TECHNOLOGIES, LTD., AND CHECK | ) | |
| POINT SOFTWARE TECHNOLOGIES, INC., | ) | |
| | ) | |
| Defendants. | ) | |

**DECLARATION OF DOUGLAS WOODLEY IN SUPPORT OF CHECK POINT
SOFTWARE TECHNOLOGIES INC.'S MOTION TO TRANSFER VENUE**

I, Douglas Woodley, hereby declare as follows:

1.     I am presently employed at Check Point Software Technologies Inc. as Head of
Western America Sales.  In my capacity as Head of Western America Sales, I am responsible for
all customer and partner facing personnel and activity for Western America, which includes the
West, Central and Canadian regions with a focus on growing new and existing channel and
customer relationships and I am knowledgeable about pre- and post-sales related functions
including: discovery of customer requirements, proposal and quote generation, technical
evaluation, pricing and implementation of Check Point Software Technologies Inc.'s products
and services.

2.     I make this declaration in support of Check Point Software Technologies Inc.'s
motion to transfer venue of this litigation from the Northern District of Illinois to the Northern
District of California.  I have personal knowledge of the facts stated in this declaration.  If I am
called upon to do so, I could and would testify competently to them.

3.      I reside in  San Jose, California and work in Redwood City, California.

4.      I understand that MPH Technologies OY alleges in its Complaint in the above-referenced litigation that Check Point Software Technologies Inc. has infringed one or more claims of United States Patent No. 7,346,926 with products embodying the technologies of VPN-1 MASS (Multi-Access Security Solution), Power-1 Security Appliances, UTM-1 Security Appliances, Safe@Office Appliances, VPN-1 Security Gateways, VPN-Power VSX, VPN-1 VE, VPN-1 SecureClient Mobile, Check Point Endpoint Security-Secure Access, Check Point Endpoint Security-Total Security, Check Point Security Gateways, and Check Point VPN Security Gateway Blades (the "Accused Products").

5.      Check Point Software Technologies Inc. is a Delaware corporation with its principal place of business at 800 Bridge Parkway, Redwood City, CA 94065.  It is a wholly owned subsidiary of Check Point Software Technologies Ltd., an Israeli company with international headquarters at 5 Ha'Solelim Street, Tel Aviv 67897, Israel and United States headquarters at 800 Bridge Parkway, Redwood City, CA 94065.  Check Point Software Technologies Ltd. operates in the United States through Check Point Software Technologies Inc. Check Point Software Technologies Ltd. is also a named defendant in this litigation.

6.      Check Point Software Technologies Inc. provides security software and appliances for corporate networks and service providers worldwide.

7.      Redwood City, California is the center of Check Point Software Technologies Inc.'s business activities.  All of its executive decision-making, financial operations, marketing, distribution and other core business activities occur there.   There are approximately 300 employees located in the Redwood City office.  All relevant US related corporate books and business records, including documents and records relating to the Accused Products mentioned

in Plaintiff's complaint, are maintained at its Redwood City headquarters.

8.     Check Point Software Technologies Inc. operates sales offices throughout the United States.  It has offices in Alabama, Arizona, Northern and Southern California, Colorado, Florida, Georgia, Illinois, Massachusetts, Michigan, Minnesota, New York, New Jersey, Ohio, Pennsylvania, Texas, Virginia, Washington and Wisconsin.  Its sales office in the Northern District of Illinois is in Downers Grove.  The Downers Grove office is a rented office used only by its 26 sales employees.  Check Point Software Technologies Inc., however, maintains all financial information, including but not limited to marketing and sales information, relating to all of its United States-based sales offices, including the Downers Grove office, in Redwood City.

9.     I am informed and believe that a number of Check Point Software Technologies Inc. (hereinafter "Check Point") executives and employees will testify as witnesses at trial based on their knowledge of key facts relevant to the allegations in Plaintiff's complaint.  These witnesses, who will provide important and necessary testimony on behalf of Check Point, include but are not limited to:

- Bob Hinden:  Mr. Hinden holds the position of Check Point Fellow.  He has held that position for the last year.  Before then, he spent 14 years with Nokia Corporation. Mr. Hinden works at Check Point's Redwood City, California headquarters and resides in Palo Alto, California.  In his role as Check Point Fellow, Mr. Hinden is responsible for developing new technical approaches to solving security problems, advancing new technologies within the company and representing Check Point at industry forums and standards organizations.  Mr. Hinden would likely testify in this matter about the Accused Products' design, development and functionality to support its defenses.

- Douglas Woodley:  I also expect to testify in this case.  As noted above, I am

Head of Western America Sales and have held this position for 1 1/2 years. Prior to taking this position, I was Western Region Director and held that position for almost 3 years. I expect to testify about the implementation, pricing, sales and revenues associated with the Accused Products.

- Dynette Light: Ms. Light is Sales Operations Support Manager. In this role, which she has held for the last 12 years, Ms. Light manages pending purchase orders coming to the company from direct partners, direct partner operational training and operational sales teams training. She works at Check Point's Redwood City headquarters and resides in Redwood City. Ms. Light will likely testify regarding the sales operations of the Accused Products. Ms. Light will face a significant personal hardship if she is required to travel to Chicago to testify in this case, as she is a part-time caretaker for her elderly mother.

- Juliette Sultan: Ms. Sultan is Head of Global Marketing for Check Point and has been with the company since 2006. She has held this position for over 2 years. Before this, she served as General Manager, Business Intelligence Business Unit for 2 years. Ms. Sultan works at Check Point's Redwood City headquarters and resides in San Carlos, California. As Head of Global Marketing, Ms. Sultan leads the company's worldwide marketing efforts. She is responsible for articulating Check Point's vision, product solutions, technology innovations and business purpose to customers, partners, media and analysts around the globe. Ms. Sultan is expected to testify regarding the marketing of the Accused Products.

- Phillip Levine: Mr. Levine is Director of US Finance for Check Point. He works at Check Point's Redwood City headquarters. As Director of US Finance, Mr. Levine is

responsible for Check Point's financial operations in the United States.  Mr. Levine is expected to testify regarding Check Point's sales channels, sales and commissions relating to the Accused Products.

10.     The claims at issue in this patent infringement lawsuit also involve documents, databases and related materials within Check Point's possession, custody or control that pertain to particular technical, financial, and sales aspects of the Accused Products.  These documents, databases and related materials are predominantly located in Redwood City.  Additionally, the personnel necessary to identify and review this large volume of information is located principally in Redwood City.  This information is not located in the Northern District of Illinois.

11.     Requiring Check Point to litigate this dispute in the Northern District of Illinois will be a far greater burden to the company and its witnesses than if the Court were to transfer the case to the Northern District of California.  As detailed above, it will professionally and personally inconvenience its numerous executives and employees who are expected to testify at court hearings and trial in Illinois.  One witness in particular, Ms. Light, will also face personal hardship because she is a part-time caretaker for her elderly mother.  Additionally, Check Point Software Technologies Inc. will incur significant costs, travel and otherwise, to defend this lawsuit in Illinois.  Finally, Check Point Software Technologies Inc. will be faced with losing a number of executives and employees for extended periods of time so that they can travel to Chicago to testify at court hearings and trial, which will be particularly detrimental to its business.

12.    In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, executed on this 19 th day of May, 2010.

Douglas Woodley

# EXHIBIT 3

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MPH TECHNOLOGIES OY,                      )
                                          )
                    Plaintiff,            )
                                          )
        v.                                )
                                          )        No.: 1:10-CV-00684
ZYXEL COMMUNICATIONS                      )
CORPORATION, ZYXEL                        )        Hon. Judge Darrah
COMMUNICATIONS, INC., NETGEAR,            )        Hon. Magistrate Judge Cox
INC., CHECK POINT SOFTWARE                )
TECHNOLOGIES, LTD., AND CHECK             )
POINT SOFTWARE TECHNOLOGIES, INC.,        )
                                          )
                    Defendants.           )

### DECLARATION OF DANA PATRICK IN SUPPORT OF
### ZYXEL COMMUNICATIONS, INC.'S MOTION TO TRANSFER VENUE

I, Dana Patrick, hereby declare as follows:

     1.     I am currently employed at ZyXEL Communications, Inc. as Director of North American Channels.   I make this declaration in support of ZyXEL Communications, Inc.'s motion to transfer venue of this litigation to the Northern District of California.   I have personal knowledge of the facts stated in this declaration and if called upon to do so, I could and would testify competently to them.

     2.     ZyXEL Communications, Inc. (hereinafter "ZyXEL") is a California corporation with its principal place of business at 1130 N. Miller Street, Anaheim, California, 92806.

     3.     I work at ZyXEL's Anaheim headquarters and reside in Redondo Beach, Los Angeles County, California.

     4.     I understand that MPH Technologies OY alleges in its Complaint in the above-referenced litigation that ZyXEL has infringed one or more claims of United States Patent No. 7,346,926 with products embodying the technologies of ZyWALLUSG100, ZyWALLUSG200, ZyWALLUSG300, ZyWALLUSG1000, ZyWALL 2 Plus, ZyWALL 2WG, ZyWALL 5UTM, ZyWALL 35UTM, ZyWALL 1050, and ZYWALL IPSec VPN Client (the "Accused Products").

     5.     In my capacity as Director of North American Channels, I am responsible for Sales, Product Management and Technical Support of ZyXEL's products, including the Accused Products, sold through indirect channels in North America.   As such, I am knowledgeable about the following areas: sales strategies, sales processes, sales budgets, revenues and forecasts, distribution and market development strategies, product management, channel marketing and

technical support. ZyXEL is a provider and distributor of complete broadband access solutions, including network security devices, for service providers, as well as for businesses and home users.

6.      ZyXEL's decision-making activities, accounting and financial operations, marketing, distribution, technical support and other core business activities take place at its corporate headquarters in Orange County.   Relevant corporate books and business records, including documents and records relating to the Accused Products discussed in Plaintiff's complaint, are maintained at ZyXEL's Anaheim headquarters.   In fact, ZyXEL's business operations are predominately located in Anaheim, California, where 66 of its 78 employees work.

7.      In addition to these 66 employees in Anaheim, ZyXEL has 6 employees located in northern California:   5 employees at its Santa Clara, California office and 1 employee who works out of a home office in Windsor, California.   A handful of other employees work in remote home offices throughout the country, including 1 in Illinois, 2 in Georgia, 2 in Texas and 1 in North Carolina.   ZyXEL does not have any facilities, offices, business records or employees in Illinois, with the exception of employee Steve Oberle, who works from his home and is not involved in any way with the Accused Products.   Mr. Oberle uses his St. Charles, Illinois residence as a home office and is responsible for promoting sales to telephone and cable MSO companies; he does not sell any of the Accused Products.

8.      As discussed in greater detail below, the key ZyXEL executives and employees who ZyXEL presently anticipates will be called to testify as witnesses at trial in this case work at ZyXEL's Anaheim, California headquarters or at its Santa Clara office in northern California.

9.      ZyXEL's relevant business activity in Illinois is limited to sales carried out by authorized third parties.   In 2008, annual sales of ZyXEL's Accused Products from Illinois represented only 0.02% of ZyXEL's total annual sales of these Accused Products in the United States.   And in 2009, annual sales of ZyXEL's Accused Products from Illinois represented only 0.26% of ZyXEL's total annual sales of these products in the United States.   More generally, ZyXEL's total annual sales generated from Illinois were only 1.28% in 2008 and 1.1% in 2009.

10.     I am informed and believe that a number of ZyXEL executive and employee witnesses are expected to testify at trial based on their knowledge of key facts relevant to the allegations in Plaintiff's complaint.   These witnesses will provide necessary and important testimony on behalf of ZyXEL.   These witnesses include Trizung Nguyen, David Nguyen, Chia-Chiang Chao and me.

11.     Trizung Nguyen works at ZyXEL's Anaheim headquarters and resides in nearby Corona, California.   Mr. Nguyen has been a Product Manager for the last six years, and before that spent one year as a Broadband Engineer.   He manages and oversees the Product Management Group, which handles product availability and pricing in the U.S. market.   He would likely testify regarding the design, development and marketing of the Accused Products in the United States, including market opportunities for the Accused Products and competitive positioning and pricing of these products in the U.S.

12.     David Nguyen is a Product Manager and has held that position for the last four years. Previously, Mr. Nguyen served as a Broadband Engineer. Mr. Nguyen lives in Irvine, California and works at ZyXEL's Anaheim headquarters. His job responsibilities include product management for ZyXEL's Business Class products including Internet Security Appliances, Network Switches and Mobile business networking; analysis of key market drivers including demand, competition and technologies; and development of new product requirements, pricing strategies, market launch plans, market forecasts, end of life planning and competitive positioning statements and tools. He would likely testify about the Accused Products' technical details including operation, configurations, specifications and implementations, as well as competitive and market analysis.

13.     Chia-Chiang Chao is an Engineering Manager and has held that position for three years. Before that, Mr. Chao served as a Software Engineer for 4 years. He works in ZyXEL's Santa Clara, California office located at 3475 Kifer Road, Santa Clara, California 95051 and resides in Saratoga, California. Mr. Chao's responsibilities include feature localization and strategic product development for channel and service provider market. Mr. Chao would likely testify as to the Accused Products' technical details including operation, configurations, specifications and implementations, as well as competitive and market analysis.

14.     I also expect to testify in this case. As noted above, I am the Director of North American Channels for ZyXEL and would testify about the marketing, sales, technical support and financial operations relating to the Accused Products.

15.     ZyXEL also anticipates that a corporate representative from its third-party software vendor, TheGreenBow, may testify in this case. TheGreenBow is a French company with United States offices at 629 Chestnut Street, Suite 401, San Francisco, California. TheGreenBow provides software sales and technical support to ZyXEL in San Francisco.

16.     Plaintiff's claims of patent infringement also involve documents, databases and related materials within ZyXEL's possession, custody or control in Anaheim, California that relate to particular technical, financial, marketing and sales aspects of the accused ZyXEL technologies. The personnel necessary to locate and review this vast amount of information are located in or around Anaheim. None of this information is located in Illinois.

17.     ZyXEL's business operations will be significantly impacted if it is required to litigate this case in the Northern District of Illinois. A number of ZyXEL's key executives and employee witnesses will be required to travel to and remain in Illinois and, consequently, be away from ZyXEL's business, which is highly competitive and rapidly evolving. Moreover, ZyXEL will incur considerable costs, including travel costs, to defend this lawsuit in Illinois. These burdens will be far greater to ZyXEL in the Northern District of Illinois than they would be in the Northern District of California.

18.    In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, executed on this _14_th day of May, 2010.

_____
Dana Patrick

# EXHIBIT 4

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

MPH TECHNOLOGIES OY,                          )
                                              )
                    Plaintiff,                )
                                              )
v.                                            )
                                              )
ZYXEL COMMUNICATIONS                          )      No.: 1:10-CV-00684
CORPORATION, ZYXEL                            )
COMMUNICATIONS, INC., NETGEAR,                )      Hon. Judge Darrah
INC., CHECK POINT SOFTWARE                    )      Hon. Magistrate Judge Cox
TECHNOLOGIES, LTD., AND CHECK                 )
POINT SOFTWARE TECHNOLOGIES, INC.,            )
                                              )
                    Defendants.               )

## DECLARATION OF RAVEN MOORE IN SUPPORT OF DEFENDANTS' MOTION TO TRANSFER VENUE

I, Raven Moore, hereby declare as follows:

1.      I am an attorney at Reed Smith LLP, counsel for Defendants NETGEAR, Inc. Check Point Software Technologies, Inc. and ZyXEL Communications, Inc.  I have personal knowledge of the facts stated in this declaration and if called upon to do so, I will testify competently to them.

2.      On May 4, 2010 I accessed the Internet website located at http://www.uscourts.gov/cgi-bin/cmsd2009.pl and selected judicial caseload profiles for the Northern District of Illinois and Northern District of California.  The website generated judicial caseload profiles for the 12-month period ending September 30, 2009 which, to the best of my knowledge, is the most current publicly available data on this website.  After these judicial caseload profiles were generated, I saved them to my computer and printed copies.  Attached hereto as Exhibit A are true and correct copies.

3.      Based on these judicial caseload profiles, from filing to trial, a case in the Northern District of California takes on average 24.5 months, while a case in the Northern District of Illinois takes 27.8 months.

4.      On May 4, 2010, I accessed the Internet website located at http://www.pwc.com/us/en/forensic-services/publications/2008-patent-litigation-study.jhtml and downloaded the "2008 Patent Litigation Study:  Damages awards, success rates and time-to-trial" prepared by PricewaterhouseCoopers.  Attached hereto as Exhibit B is a true and correct copy of the relevant pages from this Study.

5.      Based on this 2008 Patent Litigation Study, the median time-to-trial for patent cases in the Northern District of California is 2.87 years versus 3.42 years in the Northern District of Illinois.

6.      On May 13, 2010, I accessed the Internet website located at http://www.chicagoiplitigation.com/2010/04/articles/legal-news/northern-district-of-illinois-is-a-top-patent-district-any-way-you-slice-it/ and accessed the April 19, 2010 blog entry by R. David Donoghue entitled "Northern District of Illinois is a Top Patent District Any Way You Slice It." Attached hereto as Exhibit C is a true and correct copy.

7.      This blog identifies the Northern District of California and the Northern District of Illinois to be among the top six districts in the country for patent suits filed in 2009.

8.      In accordance with 28 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct, executed on this 17th day of May, 2010.

Raven Moore

# Exhibit A

## U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12-MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| **CALIFORNIA NORTHERN** | | | 2009 | 2008 | 2007 | 2006 | 2005 | 2004 | U.S. | Circuit |
| **OVERALL CASELOAD STATISTICS** | Filings* | | 7,576 | 7,295 | 7,970 | 8,683 | 6,362 | 6,727 | U.S. | Circuit |
| | Terminations | | 7,403 | 7,402 | 6,777 | 6,983 | 6,966 | 6,471 | | |
| | Pending | | 8,579 | 8,882 | 9,005 | 8,157 | 6,557 | 7,267 | | |
| | % Change in Total Filings | Over Last Year | | 3.9 | | | | | 44 | 11 |
| | | Over Earlier Years | | | -5.0 | -12.8 | 19.1 | 12.6 | 13 | 5 |
| | Number of Judgeships | | 14 | 14 | 14 | 14 | 14 | 14 | | |
| | Vacant Judgeship Months** | | 22.0 | 5.9 | .0 | .0 | .0 | .0 | | |
| **ACTIONS PER JUDGESHIP** | FILINGS | Total | 541 | 521 | 569 | 620 | 455 | 480 | 19 | 6 |
| | | Civil | 433 | 441 | 505 | 558 | 390 | 413 | 15 | 4 |
| | | Criminal Felony | 64 | 42 | 33 | 37 | 39 | 44 | 49 | 10 |
| | | Supervised Release Hearings** | 44 | 38 | 31 | 25 | 26 | 23 | 18 | 7 |
| | Pending Cases | | 613 | 634 | 643 | 583 | 468 | 519 | 10 | 2 |
| | Weighted Filings** | | 607 | 592 | 624 | 621 | 543 | 581 | 9 | 4 |
| | Terminations | | 529 | 529 | 484 | 499 | 498 | 462 | 20 | 5 |
| | Trials Completed | | 6 | 6 | 8 | 8 | 10 | 10 | 93 | 14 |
| **MEDIAN TIMES (months)** | From Filing to Disposition | Criminal Felony | 6.9 | 11.2 | 12.4 | 11.2 | 12.6 | 11.1 | 17 | 3 |
| | | Civil** | 9.4 | 7.7 | 6.7 | 7.4 | 9.8 | 8.2 | 57 | 11 |
| | From Filing to Trial** (Civil Only) | | 24.5 | 30.0 | 24.9 | 25.0 | 28.0 | 22.5 | 36 | 4 |
| **OTHER** | Civil Cases Over 3 Years Old** | Number | 1,220 | 488 | 393 | 528 | 530 | 430 | 86 | 15 |
| | | Percentage | 15.7 | 6.0 | 4.7 | 7.3 | 9.5 | 6.9 | 86 | 15 |
| | Average Number of Felony Defendants Filed Per Case | | 1.2 | 1.3 | 1.2 | 1.5 | 1.5 | 1.4 | | |
| | Jurors | Avg. Present for Jury Selection | 77.51 | 64.09 | 53.81 | 59.09 | 55.21 | 61.19 | | |
| | | Percent Not Selected or Challenged | 48.5 | 42.1 | 41.9 | 43.2 | 31.0 | 48.9 | | |

| 2009 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 6059 | 101 | 290 | 1526 | 99 | 214 | 612 | 582 | 349 | 448 | 753 | 92 | 993 |
| Criminal* | 888 | 9 | 154 | 357 | 103 | 104 | 30 | 25 | 9 | 19 | 31 | 28 | 19 |

\*   Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.

\*\* See "Explanation of Selected Terms."

## U.S. DISTRICT COURT - JUDICIAL CASELOAD PROFILE

| | | | 12 MONTH PERIOD ENDING SEPTEMBER 30 | | | | | | Numerical Standing | |
|---|---|---|---|---|---|---|---|---|---|---|
| **ILLINOIS NORTHERN** | | | 2009 | 2008 | 2007 | 2006 | 2005 | 2004 | U.S. | Circuit |
| OVERALL CASELOAD STATISTICS | Filings* | | 9,294 | 8,591 | 8,422 | 8,093 | 9,056 | 10,584 | | |
| | Terminations | | 8,509 | 8,267 | 7,929 | 8,255 | 8,805 | 11,461 | | |
| | Pending | | 9,368 | 8,605 | 8,091 | 7,711 | 7,914 | 7,706 | | |
| | % Change in Total Filings | Over Last Year | | 8.2 | | | | | 23 | 4 |
| | | Over Earlier Years | | | 10.4 | 14.8 | 2.6 | -12.2 | 64 | 5 |
| | Number of Judgeships | | 22 | 22 | 22 | 22 | 22 | 22 | | |
| | Vacant Judgeship Months** | | 18.5 | 8.1 | 15.8 | 5.7 | 12.0 | 9.6 | | |
| ACTIONS PER JUDGESHIP | FILINGS | Total | 423 | 391 | 382 | 367 | 412 | 481 | 48 | 3 |
| | | Civil | 378 | 349 | 346 | 330 | 369 | 437 | 27 | 3 |
| | | Criminal Felony | 29 | 26 | 24 | 26 | 34 | 32 | 89 | 7 |
| | | Supervised Release Hearings** | 16 | 16 | 12 | 11 | 9 | 12 | 71 | 6 |
| | Pending Cases | | 426 | 391 | 368 | 351 | 360 | 350 | 31 | 2 |
| | Weighted Filings** | | 493 | 461 | 462 | 443 | 485 | 512 | 32 | 3 |
| | Terminations | | 387 | 376 | 360 | 375 | 400 | 521 | 56 | 3 |
| | Trials Completed | | 12 | 11 | 11 | 11 | 13 | 12 | 79 | 7 |
| MEDIAN TIMES (months) | From Filing to Disposition | Criminal Felony | 15.1 | 14.5 | 14.7 | 13.9 | 12.9 | 10.3 | 91 | 7 |
| | | Civil** | 6.2 | 6.2 | 6.2 | 6.5 | 6.9 | 5.9 | 10 | 2 |
| | From Filing to Trial** (Civil Only) | | 27.8 | 27.5 | 29.7 | 26.4 | 27.0 | 28.4 | 47 | 2 |
| OTHER | Civil Cases Over 3 Years Old** | Number | 943 | 752 | 456 | 500 | 388 | 337 | | |
| | | Percentage | 11.7 | 10.2 | 6.5 | 7.4 | 5.6 | 5.0 | 79 | 7 |
| | Average Number of Felony Defendants Filed Per Case | | 1.6 | 1.8 | 1.7 | 1.8 | 1.9 | 1.9 | | |
| | Jurors | Avg. Present for Jury Selection | 49.67 | 47.17 | 45.20 | 45.07 | 51.46 | 39.36 | | |
| | | Percent Not Selected or Challenged | 32.8 | 36.2 | 31.8 | 30.9 | 36.9 | 31.0 | | |

| 2009 CIVIL AND CRIMINAL FELONY FILINGS BY NATURE OF SUIT AND OFFENSE | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Type of | TOTAL | A | B | C | D | E | F | G | H | I | J | K | L |
| Civil | 8305 | 185 | 122 | 1012 | 49 | 78 | 1549 | 1101 | 486 | 330 | 1799 | 74 | 1520 |
| Criminal* | 624 | 3 | 143 | 126 | 50 | 124 | 78 | 26 | 7 | 24 | 5 | 9 | 29 |

\*   Filings in the "Overall Caseload Statistics" section include criminal transfers, while filings "By Nature of Offense" do not.

\*\* See "Explanation of Selected Terms."

# Exhibit B

Advisory services

# A closer look*

## 2008 Patent Litigation Study: Damages awards, success rates and time-to-trial



*connectedthinking

PRICEWATERHOUSE COPERS

Indeed, since 1995, there are significant variations in the median of time-to-trial across jurisdictions. To assess the lead time, PwC focused on the most active districts. Among the courts with the most activity, Chart 7D summarizes the median time-to-trial from 1995 to 2007. Based on the cases identified, Virginia Eastern and Wisconsin Western districts have the shortest time-to-trial.

**Chart 7D: Median Time-to-Trial by District: 1995 to 2007**

| Rank | District | Median time-to-trial (in years) |
|------|----------|--------------------------------|
| 1 | Virginia Eastern | 0.88 |
| 2 | Wisconsin Western | 0.91 |
| 3 | California Central | 1.71 |
| 3 | Florida Middle | 1.71 |
| 5 | Texas Eastern | 1.79 |
| 6 | Delaware | 1.89 |
| 6 | Kansas | 1.89 |
| 8 | Pennsylvania Eastern | 1.91 |
| 9 | Texas Southern | 1.99 |
| 10 | Michigan Eastern | 2.03 |
| 11 | New York Southern | 2.10 |
| 12 | Minnesota | 2.32 |
| 13 | Florida Southern | 2.41 |
| 14 | Texas Northern | 2.41 |
| 15 | New Jersey | 2.73 |
| 16 | California Northern | 2.87 |
| 17 | Colorado | 2.99 |
| 18 | Illinois Northern | 3.42 |
| 19 | Massachusetts | 3.76 |
| 20 | Connecticut | 4.66 |
| | **Overall (all decisions identified)** | **2.16** |

The median time-to-trial for Wisconsin Western was based upon limited data.

# Exhibit C



# Chicago IP Litigation Blog

Posted at 4:33 AM on April 19, 2010 by R. David Donoghue

### Northern District of Illinois is a Top Patent District Any Way You Slice It

LegalMetric Research has been running an interesting series of reports on nationwide patent litigation statistics by district. And in each case, the Northern District remains among the top patent district courts. 2009 was the rare year that the Northern District slipped out of the top five districts in terms of filings, but it only fell to sixth. And the combination of the new Local Patent Rules and the false marking cases will change that significantly for 2010 (more on both of those issues in the next few weeks). Here are the top ten districts by the number of patent suits filed in 2009:

1. C.D. California

2. E.D. Texas

3. D. Delaware

4. N.D. California

5. D. New Jersey

**6. N.D. Illinois**

7. S.D. New York

8. S.D. California

9. D. Massachusetts

10. E.D. Virginia

The Northern District is also one of six districts that produce half of all claim construction decisions. Not surprisingly, the Eastern District of Texas, the Northern District of California and the District of Delaware produce the most, with the Northern District of Illinois, the Southern District of New York and the Central District of California filling out the six. And these six districts also issue 43% of all reexam stays.

Finally, Judge Pallmeyer is the lone Northern District of Illinois on the list of top 30 patent judges by the number of 2009 patent cases assigned to them. Pallmeyer came in at number 23. The top five spots were

held by Eastern District of Texas and District of Delaware. It is not surprising to see only a single Northern District judge on this list because the bench is relatively large, in particular compared to some of the other top patent districts like the Eastern District of Texas and the District of Delaware. But more Northern District judges will likely be in the top 30 next year because of increased filings through the first quarter, as well as the fifty or so false patent marking suits filed in the Northern District beyond the usual patent cases.

**Trackbacks (0)**

**Comments (0)**

R. David Donoghue
Holland & Knight LLP
131 South Dearborn Street, 30th Floor, Chicago, IL 60603
t: 312-263-3600
f: 312-578-6666

## CERTIFICATE OF SERVICE

Raven Moore, an attorney, hereby certifies that she served the foregoing **Notice and Motion to Transfer Venue, Memorandum in Support of Motion to Transfer Venue, Notice and Motion to File Declaration Under Seal, ZyXEL Communications, Inc.'s Disclosure Statement, Check Point Software Technologies Inc.'s Disclosure Statement, and NETGEAR's Disclosure Statement** by causing a true and correct copy thereof to be delivered via the ECF system to all counsel of record on May 17, 2010.

Dated:  May 17, 2010                                  _____s/ Raven Moore_____
                                                                     Raven Moore

James T. Hultquist (SBN 6204320)
Email:  jhultquist@reedsmith.com
Raven Moore (SBN 6280665)
Email:  rmoore@reedsmith.com
REED SMITH LLP
10 South Wacker Drive
Chicago, IL  60606-7507
Telephone: +1 312 207 1000
Facsimile: +1 312 207 6400

*Counsel for* NETGEAR, Inc.,
Check Point Software Technologies Inc.
and ZyXEL Communications, Inc.